Rickie Elwood PETERSON, Plaintiff and Appellant,

v.

Connie Rae PETERSON, Defendant and Appellee.

Nos. 16492, 16496.

Supreme Court of South Dakota.

Considered on Briefs Sept. 11, 1989.

Decided Dec. 27, 1989.

**836**

Thomas P. Tonner of Tonner, Tobin & King, Aberdeen, for plaintiff and appellant.

Nancy J. Turbak of Turbak Law Office, Watertown, for defendant and appellee.

1. Dr. Frank Dame, a clinical psychologist and expert witness for husband, characterized wife's act of attempted suicide not as a desire to die but as a cry for help, i.e., an attention getter. Husband claims that she was attempting to commit suicide on another occasion where he caught her in the kitchen with a handful of pills. She denies this.

2. Husband alleges: 1) that wife was at the movies with Laube and their daughter and that their daughter observed them holding hands; wife states that this was a spur-of-the-moment decision to go to the movies, it was not pre-arranged at all, and she also denied holding hands; 2)

MILLER, Justice.

In this divorce case we affirm the decision of the trial court which awarded custody of the parties' eight-year-old daughter to the mother. We also affirm the trial court's decision with regard to granting a divorce based on irreconcilable differences, child support payments, property division, and attorney fees.

## FACTS

The parties were married in July, 1979. They had one child. Appellant (husband) is a self-employed farmer at Willow Lake, South Dakota. He owns a small amount of livestock and equipment and rents some land. He is thirty years old and a high school graduate. In 1987, he had a gross income of $27,526. Appellee (wife) is a bookkeeper at the Lake Norden Creamery in Lake Norden, South Dakota. Her annual salary is approximately $7,350. She is twenty-eight years old and a high school graduate with some additional post-graduate training.

The parties lived together on the farm near Willow Lake and were happily married until January 1986. At that time, wife was going through a period of depression. During this time, she made an apparent attempt at suicide.[1] Fortunately, she was able to stop herself before completing the act.

Husband alleges that wife was having a relationship with another man, Todd Laube. Husband contends that this relationship has upset their daughter. Nothing in the record indicates that this relationship was adulterous.[2] Wife mainly complains that

that daughter observed wife and Laube laying on a bed together, fully clothed; wife denies this; 3) that wife and daughter were in a bar with Laube and that they left together leaving the daughter alone in the bar; however, the testimony of husband's sister indicates that she was caring for the daughter at that time and that wife told her she was stepping outside to look at Laube's motorcycle; later in the evening wife came back in and left with her daughter; and 4) that at a wedding dance wife had been dancing with Laube and when the music stopped they continued to hold hands after everyone else left the dance floor; wife states

husband neglected her and the daughter. She asserts that he works too hard, and too many hours, and failed to spend enough time with her or their daughter. She asserts that he spent too much time (including most meals and evenings) with his parents rather than at home.

In May 1987, husband filed for divorce on the grounds of extreme mental cruelty. Wife answered and counterclaimed for divorce on grounds of irreconcilable differences. Pending trial, wife retained custody of the minor child and moved to Bryant, South Dakota. The parties went through some counseling during the summer which proved to be unsuccessful. Each party was granted a decree of divorce by the trial court's judgment of September 19, 1988.

## ISSUES

## I

### WHETHER THE TRIAL COURT ERRED IN GRANTING THE DIVORCE BASED ON IRRECONCILABLE DIFFERENCES.

In his original pleadings, husband requested that a divorce be granted on the grounds of extreme mental cruelty. The trial court's decree of divorce, however, granted the divorce to each party on the basis of irreconcilable differences. He now alleges that this was error. First, he seems to overlook the fact that wife counterclaimed, asserting irreconcilable differences. Further, as wife correctly indicates, husband made no objection to the trial court's granting a divorce on those grounds until on appeal. In fact, husband's proposed findings of fact and conclusions of law state: "Irreconcilable differences have arisen between the two parties, such that they can no longer bear to remain husband and wife." Husband has failed to properly preserve this issue for appeal, *Sobolik v. Stone*, 420 N.W.2d 764 (S.D.1988); *Johnson v. John Deere Co.*, 306 N.W.2d 231 (S.D.1981).

## II

### WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING CUSTODY OF THE MINOR CHILD TO WIFE.

In awarding custody, the trial court is to be guided by what appears to be in the best interests of the child with respect to its temporal, mental and moral welfare, and if the child is of sufficient age and intelligence a court may consider the child's parental preference. As between the parents adversely claiming custody, neither shall be given preference over the other. SDCL 30–27–19; *Sobolik, supra.* The trial court has broad discretion in awarding custody of minor children. The trial court's decision will be reversed only upon a clear showing of an abuse of that discretion. *Jones v. Jones*, 423 N.W.2d 517 (S.D.1988).

Before awarding custody to the wife, the trial court found that both parents have strong emotional ties to the child and are equally capable of providing her with the love, affection, and the guidance she needs in her youth. It found that both are equally capable of providing food, clothing, medical care, and other material needs. The trial court also found that wife has been the primary caretaker of the child and that the bond between them is stronger than that between husband and daughter and that wife is better able to keep house and prepare meals. (It is also quite evident from the record that husband has not spent much time with his daughter due to the fact that he appears to spend most of his free time visiting with his parents. This routine carries on into the late evening hours.) The record also indicates that wife was responsible for the child's religious education, an area in which it appears husband did not participate. In addition, the trial court found that her living environment in Bryant is stable. Although wife had some type of relationship with Todd Laube, the trial court determined that it did

---

that they remained on the dance floor because she was showing him some dance steps.

It should also be noted that wife testified that husband had left the child alone in their home,

when she was about five years old, late one evening so that he could go get a haircut.

not amount to moral unfitness and the record supports that conclusion. (The record also indicates, without contravention, that wife has not seen Laube in several months.) It remains uncontroverted that wife went through a period of depression but does not suffer from any mental illness and is capable of performing her parental duties very well (as stated by Dr. Dame, husband's expert witness, and as determined by the trial court.) It is important to note that Dr. Dame testified that although wife was vulnerable to depression when faced with heavy stress, husband is not lacking in his own problems. Wife simply has a more emotional reaction to her problems. Also, it was apparently obvious to the trial court that husband had not been totally truthful in his testimony with respect to some of his accusations regarding wife.

Additionally, the trial court heard the opinions and testimony of experts with regard to the fitness of each party as a parent. The trial court found the testimony of Dr. Dame, regarding the vulnerability of wife to stress and his recommendation that the custody of the child be awarded to husband, unpersuasive. Interestingly, the following colloquy took place between wife's counsel and Dr. Dame regarding parties' abilities as parents:

Q If the testimony established that even during the last two years [wife] has primarily assumed the responsibility for [the daughter's] emotional and physical needs, isn't it true that that would indicate she is successfully managing that vulnerability?

A That would definitely, uh-huh.

Q And if that is true, then, there is certainly no reason to conclude that just because [wife] has this vulnerability that you have implied, there is no reason to conclude that she therefore shouldn't have custody of [the daughter], is it?

A Correct. That's correct.

Q In fact, a young mother overcoming—or excuse me, managing that vulnerability successfully is a mother who's indicating a great deal of concern and dedication to her daughter. Isn't that true?

A That is true.

Q Because it takes some special effort to overcome that vulnerability; correct?

A Sure does. You bet it does. And I want to be clear about my recommendation. I'm not recommending that [wife] shouldn't have custody of the child or is a bad parent or is dangerous to the child or is so severely impaired that she is unable to parent. What I've said in my report is, when I compare the two and I look at the best possible environment for the child, the best possible arrangement, my conclusion is that that situation would be the father having custody and the mother being involved in a, you know, frequent liberal visitation plan. That is not to say that [wife] is a bad parent or that [husband] is Mr. Parent 1987. You know, world renown champion. And that's the unfortunate part about this kind of proceeding. What my conclusion says is, as I look at the data, the best possible environment and developmental situation for the child would be in the father's custody and to have frequent and liberal visitation and contact with mother.

The trial court also found that the testimony of Donald Holub (a school psychologist, mental health professional), another of husband's expert witnesses, to be lacking in evidentiary value. The trial court noted in its findings that Holub testified that the child had expressed to him a desire to live with husband but that this testimony conflicted with the mental health report prepared by Dorrance Larson (a licensed consulting psychologist) which indicates that the child expressed a desire to live with wife.

The trial court obviously considered all the testimony of the experts. In reviewing their reports and testimony, it is clear to us that this was a "close call." In determining what was in the best interests of the child and taking the appropriate factors into consideration, we conclude that the trial court did not abuse its discretion.

## III

### WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN MAKING THE PROPERTY DIVISION.

■ The trial court is required to make an equitable division of property when a decree of divorce is granted. SDCL 25-4-44. It has broad powers of discretion in this area and the same will not be set aside or modified by this court unless it clearly appears that the trial court abused such discretion. *Jeffries v. Jeffries*, 434 N.W.2d 585 (S.D.1989); *Cole v. Cole*, 384 N.W.2d 312 (S.D.1986); *Garnos v. Garnos*, 376 N.W.2d 571 (S.D.1985).

In making an equitable division of property, the trial court must take into consideration the duration of the marriage, the value of the property of each of the parties, the ages of the parties, their health and competency to earn a living, and the contribution each has made to the accumulation of the marital property. *Cole, supra; Garnos, supra.*

In the present case, husband's argument is simply unpersuasive and fails to convince this court that the trial court abused its discretion in dividing the property.

The trial court made specific findings on each factor which this court has indicated on numerous occasions must be taken into consideration. *See Cole, supra; Garnos, supra.* The trial court also made specific findings on the value of each individual piece of personal property and also on the livestock, grain and farm equipment. It also made a finding on the total liabilities. With respect to the property valuations both parties were satisfied with the appraisals which had been made prior to the trial. The trial court found that although husband brought more assets into the marriage, each party made an equal contribution to the accumulation of property during the marriage.[3] The trial court awarded the farm assets, the farm-related debts and some household goods and miscellaneous items to husband.[4] Although the sum of the debts allocated to each is greatly disproportionate, husband's income-producing ability on the farm ($27,526 in 1987) compared to wife's employment at the Lake Norden Creamery, (annual salary of $7,350) justifies the division of farm assets and liabilities related thereto. Husband is in a more desirable position, financially, to satisfy these debts. Had the trial court separated the farm assets from its debts, it would be virtually impossible for the receiver of the farming debts to satisfy the same without the means to produce sufficient income to meet the farming indebtedness. We therefore conclude that the trial court did not abuse its discretion in the division of property and allocation of debts.

## IV

### WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN SETTING CHILD SUPPORT.

■ The trial court properly determined husband's net monthly income to be $435.75 based on his 1987 federal income tax return. The guidelines indicate that child support for one child, in husband's bracket of net monthly income, should be set between $65 and $78 per month. The trial court deviated from the guidelines and set support at $148 per month. SDCL 25-7-7 permits deviation only upon the entry of specific findings based upon the following factors:

3. Contrary to husband's complaint, it would appear that he received the benefit of the bargain with respect to the household goods and miscellaneous items. Among these, he was awarded a dining room set ($55), the clothes dryer ($50), washing machine ($75), refrigerator ($150), kitchen stove ($60), bedroom set ($225), and a lazy-boy chair ($50). The total value of the household goods and miscellaneous items he was awarded is $1,116.00. Wife was awarded $930 worth of the same type of property. Among that property, she received a bedroom set ($175) a wall recliner ($75), some kitchen chairs ($75), and a console TV ($200). Wife did not receive any appliances, although she did receive a piano ($300).

4. The trial court awarded assets to husband in the amount of $47,166 and $16,025 to the wife. Total liabilities to husband was $31,541 and $400 to wife. Subtracting each party's liabilities from their assets leaves a sum of $15,625 in net assets to each.

(1) Financial condition of the parents, including, but not limited to, income of a new spouse or contribution of a third party to the income or expenses of that parent;

(2) The standard of living of the child;

(3) The age and special needs of the child;

(4) The effect of provisions relating to custody and visitation; or

(5) Child care.

The trial court considered these factors and specifically noted that the deviation was reasonable considering the child care expenses to be incurred by wife and the contribution husband's parents make by providing him with meals and at times deferring loan principal payments. The deviation by the trial court was properly made. *See Bruning v. Jeffries*, 422 N.W.2d 579 (S.D.1988).

## V

## WHETHER THE TRIAL COURT ERRED IN DENYING WIFE'S REQUEST FOR ATTORNEY FEES.

■ By notice of review, wife requests the court to award attorney fees incurred at the trial court level. The trial court denied any award of attorney fees to either party.

In determining whether or not to award attorney fees, the trial court should consider the amount and value of the property involved, the intricacy and importance of the litigation, the labor and time involved, the skill required to draw the pleadings and the trying of the cause, the discovery procedures utilized, whether there exists any complicated legal problems, the time required to try the cause, and whether written briefs were required. *Lien v. Lien*, 278 N.W.2d 436 (S.D.1979). In denying attorney fees to both parties, the trial court cited *Lien* and stated that it had considered these factors in arriving at its decision. Awarding of attorney fees is left to the sound discretion of the trial court and such decision will not be interfered with by this court unless an abuse of discretion is found. We find no such abuse of discretion.

We conclude, however, when considering the appropriate factors, that wife is entitled to an award of $1500 in appellate attorney fees.

Affirmed.

WUEST, C.J., and MORGAN and SABERS, JJ., concur.

HENDERSON, J., concurs in part and dissents in part.

HENDERSON, Justice, (concurring in part, dissenting in part).

## PREFACE

We have, before us, an appeal in an equitable action. We should be governed, as should the trial court, by the age old principle of equality in the law; and we should not favor the mother, simply because she is the mother. Sexism, contrary to the views of those people caught up in current movements, does not exist only against women. It exists against men, too. And we have a vivid example of it before us. This State no longer observes the "tender years doctrine", which provided, *inter alia*, all things being equal, that the mother was entitled to the custody of a child of tender years. Rights of men to have custody of children was implicitly recognized by our State Legislature, when it abrogated a custodial preference based solely upon gender. *Prentice v. Prentice*, 322 N.W.2d 880 (S.D.1982). Note that effective July 1, 1979, SDCL 30–27–19(2) was amended to eliminate the concept that only the female gender could raise a child of tender years and went forward with an equal step to elevate the rights of men to raise a child or children. It reads: "As between parents adversely claiming the custody or guardianship, neither parent shall be given preference over the other in determining custody". It is obvious, when comparing the parental values of these two parties, that the trial judge forsook the equality of men when it refused to consider the reality of the domestic situation confronting the court. An abuse of discretion

did occur. A clear abuse of discretion must be established here. *Engels v. Engels*, 297 N.W.2d 489 (S.D.1980).

### Issue 1

Husband did not preserve this issue. Under *Weaver v. Boortz*, 301 N.W.2d 673 (S.D.1981), having not preserved this point of law at trial court level, he cannot, for the first time, urge it on appeal.

### Issue 2

On awarding the child to the mother, in my opinion, it was not "a close call", as characterized by the majority opinion. Father has been crucified on the cross of Motherhood and father clearly should have been awarded custody of this little girl. It is as simple as this: he lived a good life and was a stable, hard working man, who was extremely devoted to his daughter; wife lived a life of infidelity and instability, culminating in attempted suicide.

The little girl became emotionally upset at seeing her mother in bed with someone other than her father; she was emotionally upset with being required to go to a movie with her mother and this same man; the little girl was likewise distraught with watching this man hold her mother's hand as if the father did not exist at all. Mother simply did not want to live with father any longer and was no longer happy in the marriage because, of all things, her husband worked too hard (this appears to be the strongest proof against him). Mother's guilt created depression; depression created an attempt to commit suicide. Surely, the trial court abused its discretion by awarding custody of the minor child to the defendant. An excellent comparison as to the inconsistency of this Court's position may be found by reading *Haak v. Haak*, 323 N.W.2d 128 (S.D.1982).

Mother admitted to having a "relationship" with another man, but still denied having sexual intercourse with this man. At one time, the mother left the little girl in a vehicle alone, unattended, for an extended period of time. Tired of this, the little girl went to the residence where the mother was, then and there to find her mother in a compromising position as she was in bed with this same individual with whom she had admitted to having a "relationship". This emotional encounter was so impactual that she told Doctor Frank Dame, a clinical psychologist. To leave this little girl outside in a vehicle, for an extended period of time, while she remained in a home, in bed with another man, is nothing less than conduct demonstrating her to be an unfit mother to raise this little girl. The trial court entered no findings of fact as to this improper conduct, other than to characterize it as a "friendship with Todd Laube during the time when this marriage was deteriorating", *see*, finding of fact fourteen. Finding of fact eleven reflects that mother "... had a depressive episode, and made an apparent attempt at suicide at that time, which in reality was a cry for help". The mother sought professional help from a Doctor Nelson for medication. Counseling was provided by Doctor Dame. In reading through the nineteen findings of fact, I am unable to find one derogatory comment or statement about the husband and father in this case. ' Finding of fact five reflects "Strong emotional ties exist between Christa in each of her parents." Finding of fact ten reflects: "Both parties are mentally and physically fit to have custody of Christa". Finding of fact thirteen is a conclusion in that it considers "... Doctor Dame's testimony that plaintiff be given the custody of Christa due to the 'vulnerability' of Defendant to stress and find that unpersuasive". Remember that Doctor Dame testified to all of the emotional disturbances of this child resulting from her mothers' conduct with this other man, *which she actually witnessed*. For this trial court to hold that this testimony is unpersuasive, is to make a mockery of the fact finding process. Furthermore, it is a mockery of that which is right or wrong in a civilized society. Another disturbing element to me is the fact that the mother tried to teach her little girl, eight years old, to lie. If I can believe the trial transcript, the mother expressly informed the child to not inform her father of an incident wherein she was sexually abused by a male child on a playground.

How could the trial court have disregarded this testimony? However, it did. This little girl told her father of the incident and the father contacted Social Services; then, the parents of the male child were brought in for interview. This resulted in the child, who performed the sexual abuse, to be brought in for counseling. This little girl will only know right from wrong if she is taught correctly by her mother. When the mother teaches her to lie and exposes her to highly improper conduct which she, the child witnessed, how can the little girl ever know right from wrong? Obviously, these traits of the mother will cascade over onto the little girl and she will act out that which she sees and hears and is taught. Again, this demonstrates that the mother is an extremely weak and improper person to have custody of this little girl.

Amazingly, testimony of experts, who were called into this case, either by the mother or the father, was totally disregarded by the trial court. Psychologist Holub, who was involved in a mental health facility, at Huron, South Dakota, was deemed to have given testimony "without evidentiary value". This was not only an improper finding under these facts but also an error in law. In *Williams v. Williams*, 425 N.W.2d 390 (S.D.1988), this Court regretted that "there was no testimony offered from the children or from disinterested persons relating to the well-being of the children or their best interests". Now, we have such testimony before us in this case, and we take an entirely different approach. Holub's testimony should not have been disregarded altogether; he met with the little girl and talked to her on several occasions. Both he and Doctor Dame believed that it was in the best interests of this little girl to be in the custody of her father. There was additional buttressing testimony, during the trial, to support that the father was an excellent father who had a loving relationship with his daughter. In essence, the father had everything going for him in a lawsuit with the exception of the judge's decision. Doctor Dame testified that the mother's depression " ... is long rooted".

A decision of a trial judge, when he exercises his discretion, is not uncontrolled. There must be a sound and substantial basis in testimony. Such a rule may be gathered from *Flint v. Flint*, 334 N.W.2d 680 (S.D.1983) and *Hansen v. Hansen*, 327 N.W.2d 47 (S.D.1982). In the trial court, apparently, the heart had its reasons, which reason cannot know. Reason was lost. Therefore, I would reverse the trial court on the award of custody.

## Issue 3

I concur.

## Issue 4

The amount established by the trial court for child support has absolutely no relation, whatsoever, to the guidelines established by SDCL 25-7-7, which statute, I have stated in the past, is a statute of abomination. However, under chapter 220 of the 1989 session laws, this support law has been amended, under paragraph 2 thereof, whereby "Any financial condition of either parent which would make application of the schedule inequitable". Elasticity, so that the trial judge can use his mind, has finally been placed into the statute of abomination. However, this trial judge was adjudicating under the old law and he used improper criteria in determining child support by delving into a fluctuating farm income and adding this unusual dash: father occasionally eats meals with his parents. Apparently, this was viewed as a tremendous windfall to him, sufficient to abdicate the support obligations under SDCL 25-7-7. Of course, this was done to increase the child support, thereby affixing the final nail.

## Issue 5

I concur on the disposition of attorney's fees at the trial court level but would dissent on the award of $1,500 in appellate attorney's fees because she has as much wherewithal as the father. Further, he did not precipitate this divorce and is in this Court with clean hands. She is not. "The doctrine of 'unclean hands' has been upheld by courts of equity throughout the history of equity jurisprudence (21 C.J. 180) and by

this court an occasion has risen; (cites omitted)". In *Valley Bank v. Dowdy*, 337 N.W.2d 164, 166 (S.D.1983), Justice Morgan approvingly referred to the doctrine calling it the "... ancient maxim of equity jurisprudence". Presiding Judge E.W. Hertz, then serving as an Acting Justice in the case of *Kane v. Schnitzler*, 376 N.W.2d 337 (S.D.1985), referred to this doctrine, at 341 thereof, as a "... fundamental rule of law" and cited old cases in this Court with reaffirmation. Again, writing for this Court in *Stach v. Stach*, 369 N.W.2d 132, 136 (S.D.1985), Justice Morgan, on behalf of this Court, again reannounced this Court's adherence to the clean hands doctrine. Therefore, in keeping with this Court's long history, Mother would not obtain an award of appellate attorney's fees because of the facts of this case and the precedent I have cited.